## Mary Arthurs *v.* Bridgewater Gas Company, Appellant.

*Negligence—Release—Evidence.*

In an action to recover damages for personal injuries the evidence showed that while plaintiff was ill, and mentally incapable of transacting business, her husband made a settlement with the defendant, and received a large sum of money for plaintiff's injuries. About six weeks afterwards plaintiff signed a release of all damages. A clergyman who had brought about the settlement and a physician who was attending plaintiff testified that at the time the release was signed she was competent to make a contract, and was capable of understanding what she was about. Plaintiff, however, testified that no explanation had been made to her as to the paper, and that when she signed it she did not know what it was. Some time after the signing of the release an attorney at law who had been consulted by plaintiff wrote to defendant asking for information as to the amount that had been paid to the husband, but disclaiming any intention of making further demand upon the defendant. The attorney who wrote the letter testified that he had no authority from plaintiff to write the letter, and that he had written it entirely upon his own responsibility. It did not appear that plaintiff received any of the money paid to her husband by defendant. A verdict and judgment was rendered for plaintiff. The Supreme Court being equally divided the judgment was affirmed.

Argued Oct. 16, 1895. Appeal, No. 184, Oct. T., 1895, by defendant, from judgment of C. P. Beaver Co., Sept. T., 1893, No. 111, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Trespass for personal injuries. Before METZGER, P. J., of the 29th judicial district, specially presiding.

At the trial it appeared that on November 1, 1892, Mary

Arthurs, plaintiff, with her two children, were injured by an explosion of gas in the dwelling house where they were living. Defendant claimed the accident was caused by the negligence of a plumber. The evidence, however, tended to show that the defendant company was negligent.

On November 15, 1892, a settlement was brought about through Rev. Father Burns, and an agreement in writing was entered into whereby defendant agreed to pay two thousand dollars in full settlement of all damages. Daniel Arthurs, plaintiff's husband, signed the agreement and received the money. The evidence tended to show that at the time the settlement was made plaintiff was mentally incapable of transacting business. On December 31, 1892, plaintiff signed the agreement which had already been signed by her husband. Father Burns testified that before she signed the paper she understood all about the settlement, and that when she signed it she was competent to make a contract and to understand what she was about. This testimony was supported by that of plaintiff's physician and other witnesses. Plaintiff, however, testified that she knew nothing of the settlement and that when she signed the paper she did not know what it was.

On May 6, 1893, Moore, Moore & Reader, attorneys who had been consulted by plaintiff, sent to defendant the following letter :

" BEAVER FALLS, Penn'a, May 6th, 1893.

" MERRITT GREEN, ESQ., President Bridgewater Gas Company.

"Dear Sir:—During the last year, you, in behalf of your company, procured a release of all claims for damages which Daniel Arthurs and his wife Mary had against your company. Now, it seems Daniel has gotten the money you paid to him for both into his possession and refuses to allow her any benefit from the share of said damages which the law gives to her personally. Besides he threatens to pick up the money and go to Ireland. Moreover, he stints her in the matter of clothing for herself and family and treats her inhumanely ; that grace appeals from the sense of fair play, which every right-minded and right-hearted man possesses. She desires to get from her husband the money which belongs to her. To reach this end we are anxious to learn from you three things :

" First, what the gross amount paid him was ; second, how

much of this gross sum you allowed her for her personal injuries; third, whether any part of the money was paid over to a trustee for her use. Father Burns says there was talk of $500 being set apart for her use in some manner.

"We write to you not with a view of getting any more money out of your company, but for the purpose of procuring from her husband that which by law and in all honesty is hers.

"By giving us the facts called for you will confer a favor upon her and us which we shall greatly appreciate.

"Respectfully,

"MOORE, MOORE & READER."

The attorney who wrote the letter testified that he had written it upon his own responsibility, and without any consultation with plaintiff, and without her knowledge.

The court charged in part as follows:

Now, on the part of the defendant it is alleged that, although they claim they are not liable, but if they were responsible, that in order to avoid litigation, or in order to prevent a lawsuit, they effected a settlement with the plaintiff in this case. Now, I would say to you, gentlemen of the jury, that if they effected or attempted to effect a settlement, whether they succeeded in either case,—whether they merely made the proposition or attempted to make the settlement or did actually effect it, it does not matter much, you are not to consider that upon the question of liability, even if you should come to the conclusion that the settlement was not valid. They had a right to buy their peace. It is commendable for parties, if there is no fraud practiced, for one or the other to effect a settlement rather than have them come into the courts. Parties themselves ought to know their rights better than courts or juries can tell them. And, therefore, where a fair settlement has been made in such a case it should be enforced by courts and juries. It must, however, be a fair settlement. That is, it must be a settlement made by competent parties and must not have been procured by fraud practiced by one party on the other. And if there was a settlement effected in this case, gentlemen, that is, a valid one, it will end this case and ought to end it, too.

Now, let us see, for a moment, what the allegations of the one party and the other are in this respect. The defendant

has produced in evidence before you a release, signed not only by the plaintiff, but by her husband and her husband's brother; in which the consideration of two thousand dollars is acknowledged to have been received, and which purports to be a full and complete settlement of all matters in controversy in this case, or of all matters pertaining to the injuries for which a recovery is asked in this case, as well as the claim of the husband for his damages by reason of the death of his child and the loss of the service of his wife.

This settlement was mainly procured by Father Burns acting, as he claims, as agent of the plaintiff in this case. Much has been said in the argument of counsel on the one side and the other in reference to the fact as to who made the suggestion of getting Father Burns to intervene. Now, I do not regard that as very material. Those might be matters which you might consider as bearing upon the credibility of the witness, but the material matter is whether Father Burns had authority to make a settlement. Was he authorized by Mary Arthurs, the plaintiff, to make this settlement? Now, Father Burns testifies that he went there and that she said that she would be satisfied with any settlement he made, or something to that effect. I may misquote the evidence, but it will be for you to correct me. At all events, according to his testimony, she assented to his making an effort in the way of compromising this case and it virtually amounts, what he testified to, to an agreement on her part to abide by what he did. That is his testimony. There are other questions in reference to the question of authority that I might call your attention to, if I deemed it necessary, but I will only mention one or two little matters. It is alleged that she received a small portion of this money. Now, if she received that money knowing that it was by virtue of this settlement, that would be a strong corroborative circumstance of the fact that she had authorized this settlement to be made. And there are other matters which you will probably readily recall and from which you can determine whether Father Burns tells the truth or not. Now, then, it is in evidence here that Father Burns had informed her that a settlement was effected for the sum of two thousand dollars. It is not disputed that that sum was paid by the company to Father Burns, and it is not disputed that the husband of the plaintiff in this case had gotten

most of the money. These are matters that cannot be controverted. But at the time when the settlement was effected, when the contract of compromise, so to speak, was consummated and executed, that is, when the money was paid, Mrs. Arthurs, the plaintiff, did not sign the written contract, because, as it was alleged, she was at that time under such physical disability that she could not hold the pen or do anything with her hands.

Now, on the part of the plaintiff in this case, they seek to make void this settlement on the ground that at the time it was procured the plaintiff was not of sufficient mental capacity to make a valid contract. They call a number of witnesses on the part of the plaintiff who testify, that at that time she was laboring under such extreme pain, both mental and physical, that she was not competent to understand what she was doing. This period of time continued for about three weeks from the time of the fire, which would bring it a few days past the time when this contract was made and signed by the other two parties, the husband and the brother.

On the part of the defendant, however, it is claimed that she was only physically incapable of executing a contract of that kind ; that mentally she knew what she was doing, but was physically incapable of writing. And they rely upon the testimony of Father Burns, who had the conversation with her, and who tells you she talked as intelligently to him then as at any other time, but that she was in agony and in pain. And, perhaps, the principal reason that is given here by the witnesses for believing that she was incompetent, is the fact that she was suffering great pain. Now, we will leave it to you to determine, under all the evidence in this case, whether the reasons given by the witnesses for believing that she was not capable of entering into a contract at that time were sufficient to satisfy you of her mental inability to do it, because it does not make any difference under what physical pain she was laboring, or even mental pain, so long as she knew what she was doing, that is the question. It would not make any difference. And it often occurs, for instance in men making wills, they make them at the very last moment, when they are suffering the most intense pain and agony, and yet their mind is sufficiently clear to enable them to know what they are doing. Was that the case here?

The nurse, and some of the other witnesses, testify that most of the time she was delirious, laboring under fever, but they also say sometimes for a few minutes she was conscious and was intelligent, as I understood their testimony. Now, if it were true even that she was not competent at all times, yet if at the time Father Burns talked to her she understood what she was doing, and at that moment she authorized him to make this settlement, and it was made, then we say to you the verdict must be for the defendant.

Now, in case you should find that she was not competent at that time, but that she had authorized Father Burns to make a settlement, but that at the time she did so her mental condition was such that she was not able to contract, and therefore not legally qualified to appoint anybody to act for her— although you may find that and yet, if subsequently she ratified what Father Burns had done in her behalf, then she could not complain—she could not recover. Now, did she or not afterwards do anything to ratify this contract, and at the time she did these acts was she in her right mind then, and did she have mental capacity to know what she was doing? Because if she did, and with a knowledge of what had been done for her she afterwards signed this paper, then that ought to end this case, because that was the real consummation of the contract, as far as she was concerned,—she had not signed before. It is not pretended here that she was a party to this contract, except through her agent, at the time the money was paid, but that she did afterwards, on the 31st day of December, as the testimony here shows, sign this contract.

What was her condition at that time? That will become a serious question; because if her disability had not been removed, and even assuming that she had not been in her right mind when the contract was entered into by Father Burns,—if that disability had been removed and she had become conscious and competent to do business of this kind, then when she put her name to this paper she ratified it and it is her contract and it binds her. Now, what are the facts in relation to that? Father Burns testifies that the defendant, previous to her signing this paper, he was to see her and told her that a couple of the Bridgewater Gas Company's men would be there the next day with a paper for her to sign; that she spoke about the money and that

he told her that there was one hundred pounds deposited in the bank for her use, and that she was told the other $1,500 had been paid to her husband. You will recollect the testimony of Father Burns, the questions that she asked him and the answers he gave her. If this were true, then on the 30th day of December, the day before she signed the paper, she did know just what the arrangement was, because that had been the arrangement. For you will remember that, at the time the settlement was made the arrangement was finally consummated and the money paid, $500 should be put to her use and $1,500 were paid to the husband. Now, Father Burns claims that, on the day before the signing of this paper, he told her this and told her the men would be there the next day; the men came the next day and she signed it. They called a number of other witnesses here to show that at that time she was in her right mind and that any mental disability she might have had previously had been removed. The same physician who testified for the plaintiff that she was not competent to make a contract the first three weeks after the fire, was called by the defendant, on the matter we are now talking about, and he then testified that after that she was competent to make a contract and was intelligent to understand what she was about. Some of the other witnesses called, testified to that fact. And in opposition to this testimony the plaintiff testifies herself to the fact that she did not know and had no recollection of any such conversation, and did not know at the time she was signing this paper what it was. I believe that all the testimony the plaintiff produced to rebut this other testimony was the testimony of the plaintiff herself. What, then, are the true facts in the case?

By Mr. Moore: Recall her testimony of the conversation with Father Burns at that time. She tells the conversation entirely different.

The Court: When I said, gentlemen, the plaintiff did not know and had no recollection of this conversation, I meant the conversation as detailed by Father Burns. She speaks of some other things, about the doctor and nurse, etc.

By Mr. Moore: What was said about the two men coming down to see her, and so on?

The Court: Gentlemen, all I have to say is that the plaintiff

herself gives a different version of it from what Father Burns does.   I cannot give you the whole of what she testifies to, but, substantially, it is as I have told you.   She testifies in contradiction to Father Burns and speaks of other conversations, but disclaims all knowledge of the conversation he testifies he had with her, and also claims that the conversation in reference to the men coming there was different from what he testifies that it is.   Of course, you must consider all this evidence on both sides and determine where the truth lies.   Now, there is another piece of evidence here that bears upon this question of ratification, and the effect you will give to it is for you to determine.

It seems that some months after this paper was executed her attorneys wrote a letter to the president of the gas company, which letter was read in your hearing, and in which it is claimed that this settlement had been made, and in which they seek for information in regard to the amount of money she should receive or that her husband received.   And in this letter it is asserted that they do not claim anything more from the company, or something to that effect.   I may not be able to give the exact language, but the letter you heard read, and I have probably given you the substance of it.   Now, if that letter was written by the attorneys of Mary Arthurs, and if they got their information from Mary Arthurs, upon which that letter was based, then that would look as if Mary Arthurs at that time did not intend to claim that this contract was not legal.   But it would be evidence of ratification on her part if she gave her counsel that information.   But, it is fair to the plaintiff to say, if counsel would write such a letter on their own responsibility, without any consultation with the plaintiff, and without her knowledge and without communicating such facts to her, that it would not bind her.   But if they were acting for her as her attorneys, and by her information they wrote this letter, it is evidence in this case upon the question of ratification.   And I say again, if she received any money, no matter how small it was—if she knew when she received it—or, I might say, if she knew before this suit was brought that that money was part of the consideration of this contract, and kept it, that would be evidence of ratification, because she could not keep the money, even a part of it, and still avoid the contract; that is, if she knew the facts.   Of course, before a party can ratify a contract

they must know all the facts in relation to it. And hence it becomes material in this case as to whom you will believe.

Defendant's points were among others as follows:

3. If the jury believe that the plaintiff did, in fact, appoint Father Burns to settle and adjust the claim for damages, as set forth in the first point and that the said Burns did make said settlement with the defendant company, then the plaintiff cannot recover, even if the plaintiff was mentally unsound at the time of the appointment of the agent, unless the plaintiff proves that the defendant had notice of such mental unsoundness, or was guilty of fraud in the transaction. *Answer:* We affirm this point, but qualify it by saying that the company would be charged with notice of such mental unsoundness, if they had knowledge of such circumstances as would lead a prudent man to make inquiry, and they failed to make such inquiry. [1]

5. If the jury believe that Messrs. Moore, Moore & Reader, were attorneys for the plaintiff on the 6th day of May, 1893, at the date of the letters offered in evidence, then the plaintiff cannot recover in this case, there being no evidence or claim on her part that she was then mentally unsound. *Answer:* We cannot affirm this point because it asks us to say, as a matter of law, that that would be conclusive and would prevent a recovery. We cannot so instruct you, gentlemen. We have already stated to you how you may consider that evidence and we leave it to you to decide. That is, this evidence on the question of ratification—if the letter was written by her authority. [2]

6. If the jury believe that the plaintiff received any portion of the money paid to Father Burns by the defendant company, knowing at the time she received it, or afterwards learning that the money so received was a part of that paid in settlement of the claim in controversy, and has not returned or offered to return the same, the plaintiff cannot recover. *Answer:* We affirm this point, provided you find that she learned that the money was a part of the consideration of this settlement prior to the bringing of this suit. If she learned that prior to the time of the bringing of this suit, she should have returned the money, because she could not keep the money, or any part of it, and also at the same time enforce payment of the claim. [3]

Verdict and judgment for plaintiff for $2,150. Defendant appealed.

*Errors assigned* were (1–3) above instructions, quoting them.

*J. R. Martin* and *W. H. S. Thomson*, for appellant.—Mrs. Arthurs knew of the release which she had signed; knew that certain money had been paid for her. She went to her attorneys in regard to it, and they, acting for her and in her interests, for the purpose of recovering from Daniel Arthurs her share of the money, wrote the letter in question.

The defendant's third point should have been affirmed without qualification. The plaintiff was presumed to be sane. The defendant made the settlement in good faith with the agent appointed by the plaintiff, without notice of the latter's mental unsoundness, and that was the measure of its duty.

The defendant's sixth point should have been unqualifiedly affirmed: Gibson v. Western New York & P. A. R. Co., 164 Pa. 142.

*Winfield S. Moore, Alfred S. Moore, Frank E. Reader* and *James H. Cunningham* with him, for appellee.—The plaintiff denies that she ever employed Father Burns, or authorized him to make any settlement for her with defendant company. When we have both the plaintiff and the alleged agent denying the agency, it is certainly conclusive proof, in the absence of any evidence to the contrary.

The defendant company knew of the accident, of the death of the children, and of the serious injury of the plaintiff. It was seeking a settlement with Daniel Arthurs; its employees and agent were at the house, and knew the condition of the plaintiff's mind.

Whether the plaintiff was of unsound mind on December 21, the time when Father Burns had her put her bandaged hand to a pen, making her mark to the release in question, is not worth discussion, for the reason that, whether sound or unsound in mind, she was not made acquainted with the contents of the instrument, but simply in obedience to the request or command of the priest of her church, touched the pen held by him.

The letter of Moore, Moore & Reader could only be evidence of ratification. The letter was not written by the direction or authority of plaintiff.

There is nothing in the appellant's third assignment of error.

Not one cent of the money which was paid to Daniel Arthurs ever went into the hands of Mary Arthurs.

In the case cited by counsel for appellant, 164 Pa. 142, it was proved that the plaintiff had received money while mentally unsound, and that after gaining his mental equilibrium he ascertained that the money was received from the defendant company, and the consideration therefor, and he retained the money, and at no time ever refunded or offered to refund the same. That case should be well cited by the appellee in support of the ruling of the lower court upon this point.

PER CURIAM: October 24, 1895:

The six justices before whom this case was heard being equally divided in opinion, it is ordered that the judgment of the court of common pleas stand affirmed.